UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| SHAWN FLOWERS-BEY, | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| v. | ) Case No. 2:19-cv-00070-SRC |
| | ) |
| TAMARA ANDERSON, et al. | ) |
| | ) |
| Defendant(s). | ) |

### Memorandum and Order

Inmate Shawn Flowers-Bey suffered ongoing back pain that doctors at Northeast Correctional Center diagnosed as muscle spasms in his back.  Because of his condition, Flowers-Bey used a wheelchair and received a no-work lay-in excusing him from working in the prison.  But after prison staff observed him playing basketball without the wheelchair, they took his wheelchair and gave him a new work assignment as a landscaper at the prison.  Flowers-Bey filed an action under 42 U.S.C. § 1983 against several correctional officers and prison staff, alleging that his assignment to the landscaping position was in retaliation for his filing of a grievance against medical staff and amounted to deliberate indifference to his serious medical needs.  Defendants filed two motions for summary judgment.  Docs. 46, 53.

**I.      Background**

Shawn Flowers-Bey, an inmate at the Northeast Correctional Center ("NECC"), filed a 42 U.S.C. § 1983 action against eight employees of NECC:  Tamara Anderson, Veronica Uebinger, Leslie Lebon, Kristine Cutt, Tanya Fielder, John Pierceall, Kevin Armistead, and

1

Alana Winter.[1]  Doc. 1.  Flowers-Bey alleges that Defendants either retaliated against him for filing a grievance, in violation of the First Amendment, or were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment.  Doc. 22 at 9–12.  Flowers-Bey filed suit against all Defendants in both their official and individual capacities, but the Court dismissed Flowers-Bey's official-capacity claims.  Doc. 5 at 9; Doc. 30.  Flowers-Bey twice filed motions for appointment of counsel, which the Court denied, finding that the action involves straightforward questions of fact.  *Id.* at . 5 at 9; Doc. 21 at 3.

Flowers-Bey alleges that Correctional Officers Alana Winter, John Pierceall, and Kevin Armistead were deliberately indifferent to his serious medical needs.  Doc. 22 at pp. 9–10.  Winter allegedly searched Flowers-Bey's cell on multiple occasions to confiscate his medical assistive devices, while Pierceall and Armistead issued conduct violations to Flowers-Bey for failing to show up to work while he had a no-work lay-in.  *Id.*  Flowers-Bey claims that Health Service Administrator Tamara Anderson and Security Sergeant Veronica Uebinger both conspired to place him on the prison captain crew (landscaping), in retaliation for his filing of a grievance related to his medical treatment.  *Id.* at p. 9.  Flowers-Bey claims that Caseworker Tanya Fielder and Functional Unit Manager Kristine Cutt forced him to continue working on the captain crew by denying his grievance and grievance appeal, in further retaliation for his use of the grievance process.  *Id.* at p. 11.  Finally, he alleges that Acting-Warden and Functional Unit Manager Leslie Lebon forced him to work despite his lay-in and authorized a search of his cell, including confiscation of his personal property, in retaliation for his grievances.  *Id.* at pp. 11–12.  Anderson filed a Motion for Summary Judgment, Doc. 46, as did the remaining Missouri

---

[1] Flowers-Bey also sued Dr. Michael Paniaugua, Bonnie Brennen, Dr. Tomas Cabrera, Warden Chantay Godert, and Sergeant Don Flies, but the Court dismissed these defendants because Flowers-Bey failed to state a constitutional claim against them.  Doc. 5 at 7–8.

2

Department of Corrections ("MDOC") Defendants, Doc. 53. The Court grants both motions. Docs. 46, 53.

## II.   Facts

Defendants, in accordance with the Court's Local Rules, submitted statements of uncontroverted material facts. Docs. 48, 55. Flowers-Bey filed responses to Defendants' motions for summary judgment but did not specifically controvert Defendants' statements of uncontroverted material facts in accordance with the Federal Rules of Civil Procedure and the Court's Local Rules. Docs. 52, 66. Instead, Flowers-Bey attached a "Statement of Disputed Factual Issues" with each of his responses. Doc. 52 at pp. 10–11; Doc. 66 at p. 11. He also filed his own sworn affidavits explaining how Defendants allegedly violated his constitutional rights. Doc. 52 at p. 1; Doc. 66 at p. 3.

Flowers-Bey technically did not follow the procedures set forth in Rule 4.01(E) of this Court's Local Rules because he failed to specifically controvert the assertions in Defendants' statements of uncontroverted material facts. The Court, however, will afford Flowers-Bey some leniency in complying with the local rules as Flowers-Bey is proceeding pro se and the Court maintains discretion in enforcing its own local rules. *See Reasonover v. St. Louis Cty.*, 447 F.3d 569, 579 (8th Cir. 2006) (judges have "broad discretion to set filing deadlines and enforce local rules"); *see also Anderson v. Bristol, Inc.*, 936 F. Supp. 2d 1039, 1046 n.2 (S.D. Iowa 2013) ("[T]he Court grants leniency to pro se litigants and may excuse failures to comply with local rules . . .").

The Federal Rules of Civil Procedure require a nonmovant at summary judgment to dispute facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . ,

3

admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). Flowers-Bey's "Statement[s] of Disputed Factual Issues" did not cite to particular materials in the record, but his affidavits themselves identified factual disputes by identifying factual statements in Defendants' briefs and explaining Flowers-Bey's version of events.   Doc. 52 at p. 1; Doc. 66 at p. 3.  The Court therefore will not deem the facts in Defendants' Statements of Uncontroverted Material Facts as admitted for purposes of summary judgment unless Flowers-Bey failed to address them in his "Statement[s] of Disputed Factual Issues" and accompanying affidavits.

      A.      **Uncontroverted material facts**

           1.      **Flowers-Bey's medical history at NECC**

In early 2016, Flowers-Bey saw Dr. Thomas Pryor for the onset of back pain.  Doc. 48 at ¶ 12.  Dr. Pryor assessed discogenic pain to the right leg and provided stretches for the spine and a trial back brace, as well as medication.  *Id.*  Flowers-Bey's back pain did not go away, and he returned for numerous appointments between February and October 2016.  *Id.* at ¶¶ 13–18.  Flowers-Bey also complained of pain from a former gunshot wound to his knee.  *Id.*  Medical staff at NECC recommended exercise therapies and provided him with medication and several lay-ins from his work as a medical porter at the prison.  *Id.*

In early October 2016, Flowers-Bey self-declared an emergency for back pain and saw Nurse Heather Swope.  *Id.* at ¶ 19.  Swope provided Flowers-Bey with a 24-hour lay-in and instructed him to return the next day if symptoms persisted.  *Id.*  Two days later, Flowers-Bey saw Dr. Miguel Paniagua for renewed complaints of lower back pain.  *Id.* at ¶ 20.  Dr. Paniagua assessed lower back pain syndrome and ordered an x-ray of the lumbar spine, a back brace, and lay-ins from work and a bottom bunk for one month.  *Id.*

Over the next ten days, Flowers-Bey visited the infirmary eight times. *Id.* at ¶¶ 21–29. The x-rays of his lower back displayed levorotoscoliosis (curvature and twisting of the spine) but no acute fracture or vertebrae out of place. *Id.* at ¶ 19. Flowers-Bey received Toradol and other medications for his pain and used a wheelchair for several days. *Id.* at ¶¶ 21–22. On October 13, Nurse Practitioner Brennan assessed a probable myospasm (muscle spasm) in his back and prescribed medication and back stretches. *Id.* at ¶ 26. The next day, Brennan prescribed additional medications for his pain, after Flowers-Bey reported that his back had frozen up when he stood up in his cell. *Id.* at ¶¶ 27–29. Brennen submitted a referral request for a CT of the lumbar spine, observing that Flowers-Bey was walking fine a few days ago but then suddenly reported he could no longer move. *Id.* at ¶ 28. The Regional Medical Director, Dr. Deghetto, denied the request for a CT, based on Flowers-Bey's normal exam and x-rays. *Id.*

Flowers-Bey visited the infirmary again on October 17 for lower back pain and received new medications as well as adjustments to his current medications. *Id.* at ¶ 30. By October 20, Flowers-Bey exhibited significant improvement in function and range of motion, and Nurse Joyce Wheeler documented that Flowers-Bey had spent 80% of his day in his wheelchair, socializing with staff and other inmates without any pain complaints. *Id.* at ¶ 31. On October 21, Flowers-Bey told Brennan that he felt better but he wanted a new mattress. *Id.* at ¶ 32. Brennan observed that Flowers-Bey had been up washing dishes, folding laundry, and walking around, without any acute distress or pain complaints. *Id.* Brennan assessed a resolving myospasm. *Id.* On October 24, Flowers-Bey saw Dr. Tomas Cabrera for reevaluation of his back pain. *Id.* at ¶ 33. Dr. Cabrera recommended more back exercises and ordered x-rays for Flowers-Bey's reported hip pain. *Id.* The x-rays came back unremarkable, and Dr. Cabrera encouraged Flowers-Bey to continue his exercises for the back pain. *Id.*

On October 26, Flowers-Bey saw Brennan, and again requested a new mattress for his back pain. *Id.* at ¶ 36. Brennan explained that this was not controlled by the medical staff. *Id.* She also told Flowers-Bey that the medical providers had determined he would receive continued conservative treatment for his back pain and that no CT or MRI was indicated at that time. *Id.* The next day, Brennan observed that Flowers-Bey was in no acute distress when performing normal activities and that he was mobile with the use of the wheelchair. *Id.* at ¶ 37. She noted that he had a no-work lay-in and that he still used a wheelchair. *Id.*

Nearly a month later, on November 20, a medical provider was called to review video footage of Flowers-Bey from Housing Unit 4. *Id.* at ¶ 39. Footage from November 6 showed Flowers-Bey playing basketball with no signs of distress and attempting jump shots. *Id.* More footage from November 11 at 1:53 p.m. showed Flowers-Bey playing basketball without his wheelchair with an even gait. *Id.* Additional footage showed that on November 11 at 6:36 p.m., Flowers-Bey was standing next to the door to the adjacent prison wing. *Id.* Flowers-Bey knocked on the door and waited for someone to answer. *Id.* When no one answered, Flowers-Bey returned to his wheelchair and sat down. *Id.* Soon an inmate from the wing next door knocked on the door in response and Flowers-Bey lifted himself up with his arms and kicked his legs over the footrests on the wheelchair, was air-bound, and landed on his feet. *Id.*

On November 21, 2016, Flowers-Bey saw Brennen again for his chronic back pain. *Id.* at ¶ 40. Brennan observed that Flowers-Bey's posture was poor and that he was still using the wheelchair. *Id.* She assessed a low back strain and instructed him to complete his exercises and return to normal activity. *Id.* She prescribed acetaminophen for pain, noting that Flowers-Bey was seen playing basketball and was able to do jump shots, and that he no longer required a

6

wheelchair.  *Id.*  The medical department confiscated Flowers-Bey's wheelchair.  Flowers-Bey Dep. 28:9–29:5.

### 2. Prison work

From October 2015 to December 2016, Flowers-Bey worked as a medical porter.  Doc. 55 at ¶ 17.  His duties as a medical porter included sweeping, mopping, taking out the trash, and "a lot of lifting."  *Id.* at ¶ 18.  He worked five days a week, with seven-and-a-half hour shifts each day.  *Id.* at ¶ 19.  Flowers-Bey was excused from his work as a porter when he had a no-work lay-in from the medical department.  *Id.* at ¶ 37.  Flowers-Bey was reassigned to the prison captain crew in December 2016, where he worked until March 2020.  *Id.* at ¶ 20.  His duties on the captain crew were similar "labor-wise" to his duties as a medical porter, except that the captain crew completed landscaping work outdoors.  *Id.* at ¶ 21.  His work schedule remained roughly five days a week with seven-hour shifts per day.  *Id.* at ¶ 22.

Correctional Officer Kevin Armistead issued a conduct violation to Flowers-Bey on April 17, 2017 for failure to report to his work shift, violation number 17-2361.  *Id.* at ¶ 11.  The next day, Correctional Officer John Pierceall issued another conduct violation to Flowers-Bey for the same thing, violation number 17-2372.  *Id.* at ¶ 9.  Flowers-Bey had not come to work either day, citing his no-work lay-in.  *Id.* at ¶¶ 10, 12.  Both of these conduct violations were later expunged because Flowers-Bey had a valid "no work lay-in" on those days.  *Id.* at ¶¶ 12–14.

### 3. Cell searches

Between late November and early December 2016, Correctional Officer Alana Winter visited Flowers-Bey's cell on several occasions to search his cell for unauthorized medical assistive devices.  Doc. 55 at ¶ 15.  Winter did not remove the wheelchair from Flower-Bey's cell, as the wheelchair had already been taken by medical staff.  *Id.* at ¶ 16; Flowers-Bey Dep.

28:9–29:5.  Winter did not actually take any medical assistive devices belonging to Flowers-Bey, only a cane that belonged to a previous inmate who lived in that cell.  Flowers-Bey Dep. 29:12–29:22.

    **4.**    **Grievances**

Flowers-Bey submitted an Informal Resolution Request ("IRR") NECC 16-1808 in late November 2016.  Doc. 48 at ¶ 41.  The IRR complained of "Deliberate indifferent med. staff at N.E.C.C. not wanting to give proper test to find out core issue of my back problem" and mentioned that "I can't go eat because they took my wheelchair for taking shots with the basketball."  Doc. 48-7 at 11.  Prison staff received the IRR on December 18 or 19, 2016, but the medical department did not receive it until January 5, 2017.  *Id.* at ¶ 42.  Director of Nursing Dawn Neff responded to the IRR on March 21, 2017.  *Id.* at ¶ 43.  Flowers-Bey also submitted a formal Grievance NECC 16-1808 on March 16, 2017, which was received on April 5, 2017.  *Id.* at ¶ 44.  Health Service Administrator Tamara Anderson and Medical Director Dr. Michael Whitlock denied his Grievance on April 30, 2017.  *Id.* at ¶ 45.  Flowers-Bey appealed the denial of the Grievance on June 8, 2017, and his appeal was denied on July 7, 2017.  *Id.* at ¶ 46.

On March 31, 2017, Flowers-Bey submitted IRR NECC 17-471, relating to his placement on the captain crew.  Doc. 55-7 at pp. 2–4; Doc. 55 at ¶ 34.  In the IRR, Flowers-Bey claimed that Sergeant Funk was harassing him by delaying Flowers-Bey's request for a job-change.  *Id.*  The IRR did not mention any other parties or incidents.  *Id.*  This IRR was denied, and Flowers-Bey later filed an official grievance naming Corrections Officers Fielder, Winter, Armistead, and Pierceall, as well as Acting-Warden and Functional Unit Manager LaBon, for alleged incidents that occurred after he had filed the initial IRR.  Doc. 55-9 at pp. 7–9.  Flowers-Bey never attempted to file an IRR regarding these claims, however.  Doc. 55 at ¶ 38.

Flowers-Bey also filed three more IRRs and three more accompanying formal Grievances between 2018 and 2019, all related to his medical care. *Id.* at ¶ 49–54.

**B.     Disputed facts**

Flowers-Bey and Anderson dispute whether Anderson had any role in assigning Flowers-Bey to the captain crew. Flowers-Bey claims that Anderson conspired with Sergeant Uebinger to assign him to the captain crew because he filed IRR NECC 16-1808 against the medical department. Doc. 22 at p. 9.

Anderson asserts that as the Health Services Administrator at NECC, she was the chief administrative manager of the on-site health services department but had no role in determining inmate work assignments. Doc. 48 at ¶¶ 3–5. Only the sergeants assigned the work duties at NECC, and Sergeant Uebinger was responsible for determining the work duties for the medical department. *Id.* at ¶ 6. Anderson declares that Uebinger never consulted her in regard to Flowers-Bey's work assignment or any other inmate work assignments. *Id.* at ¶¶ 7–8. Anderson states that she became aware that Flowers-Bey filed a grievance, but she had no role in determining his work assignment, as that is not the function of the Health Services Administrator. *Id.* at ¶ 9. Further, she states that she was not involved in the decision to take away any medical assistive devices from Flowers-Bey. Id. at ¶¶ 10–11.

Flowers-Bey takes issue with Anderson's claims. Doc. 52 at ¶ 2. He asserts in an affidavit that Anderson "was well aware of daily operations of N.E.C.C. Medical Unit, and had great influence among her co-workers of D.O.C." *Id.* He states that "Ms. Anderson and Ms. Uebinger worked hand in hand with one another in the medical unit after working with one another over a period of time, you begin to form a system as well as a work relationship. Also, by Ms. Anderson being the manager of the medical unit she definitly [sic] had a role in if you

9

continued to work in medical or not.  Her job title may have said H.S.A., but if she said fire you, you got fired." *Id.*  He also claims that he filed the IRR against the medical department on November 30, 2016, and that only "6 days later I was placed on the prison captain crew (landscaping), forced to work hard labor, forced to stand if I didn't I was threatened with the hole (ad-seg) . . ." *Id.* at ¶ 9.

### III.     Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment. *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that

10

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### IV. Discussion

#### A. Anderson's motion for summary judgment

Anderson moves for summary judgment on Flowers-Bey's First-Amendment-retaliation claim. Doc. 46. Anderson argues that she had no role in Flowers-Bey's placement on the captain crew and that Flowers-Bey cannot show that his IRR was the cause of any adverse action against him. *Id.* To establish a claim for First-Amendment retaliation, a plaintiff must prove "(1) he engaged in a protected activity, (2) [the defendant] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir 2013).

The Eighth Circuit Court of Appeals has "repeatedly held that '[t]he filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity.'" *Gonzalez v. Bendt*, 971 F.3d 742, 744–45 (8th Cir. 2020) (quoting *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007)). "Therefore, 'actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983.'" *Id.* at 745 (quoting *Nelson v. Shuffman*, 603 F.3d 439, 450 (8th Cir. 2010)). Meanwhile, "[t]he ordinary-firmness test is designed to weed out trivial matters from substantial violations of the First Amendment." *Id.* (citing *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013)). "The test is an objective one, not subjective. The question is.... [w]hat would a person of 'ordinary firmness' have done in reaction to the [adverse action]?" *Id.* (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)). "Adverse actions which may show retaliation include denial of privileges . . . or acts worsening an inmate's

11

working conditions." *Spencer*, 738 F.3d at 911; *see also Lewis*, 486 F.3d at 1029 ("Retaliatory action that worsens an inmate's working conditions can be sufficiently adverse to be actionable under § 1983."). "The key question is whether the actions were taken in retaliation for engaging in protected activity." *Spencer*, 738 F.3d at 911.

Anderson does not dispute that Flowers-Bey engaged in protected activity by filing an IRR regarding his medical care. Doc. 47 at 13. She argues that Flowers-Bey presents insufficient evidence to show that she was involved in the decision to place Flowers-Bey on the captain crew. Doc. 56 at pp. 2–3. Anderson points out that as the Health Services Administrator, she had no control over inmate work assignments, and her duties did not include advising on inmates' work assignments. *Id.* She declares that she never communicated with Uebinger regarding Flowers-Bey's work assignment. *Id.* Anderson also explains that it would have been impossible for her to retaliate against Flowers-Bey for filing his IRR. Doc. 47 at pp. 13–14. Flowers-Bey claims that Anderson and Uebinger placed him on the captain crew on December 6, 2016, in retaliation for filing IRR NECC 16-1808. Doc. 22 at p. 9. Yet Anderson observes that Flowers-Bey's IRR had not been dated (December 9, 2016), received by prison staff (December 18 or 19, 2016), or arrived at the medical department (January 5, 2017) before the date Flowers-Bey himself states he was placed on the captain crew (December 6). Doc. 48 at ¶¶ 41–42; Doc. 48-7 at p. 11.

Flowers-Bey submitted an affidavit stating that he disagrees with Anderson's claim that she had no role in determining his work assignment. Doc. 52 at ¶ 2. He asserts that Anderson "had great influence among her co-workers" and "worked hand in hand" with Uebinger. *Id.* He claims that "after working with one another over a period of time, you begin to form a system as well as a work relationship" and that "if [Anderson] said fire you, you got fired." *Id.* He asserts

12

that he had actually filed the IRR on November 30, 2016, and that "6 days later I was placed on the prison captain crew." *Id.* at ¶ 9.

Flowers-Bey does not create a genuine issue of material fact as to Anderson's involvement in assigning him to the captain crew. Under Rule 56(c)(4) of the Federal Rules of Civil Procedure, "An affidavit or declaration used to support or oppose a motion *must be made on personal knowledge*, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." (emphasis added). Mere "speculation and conjecture are insufficient to defeat summary judgment." *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006); *see also Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial.") (citing Fed. R. Civ. P. 56(e)).

Flowers-Bey possesses no personal knowledge of Anderson's duties as the Health Services Administrator or whether Anderson communicated with Uebinger regarding Flowers-Bey's work assignment. Doc. 52 at ¶ 2. His evidence in opposition relies on speculation rather than personal knowledge. *See id.* Thus Flowers-Bey's statements in his affidavit regarding Anderson's role in his assignment to the captain crew are insufficient to defeat summary judgment. *See* Fed. R. Civ. P. 56(c)(4). And even if the Court assumed that Flowers-Bey submitted his IRR before he was placed on the captain crew on December 6, 2016, Flowers-Bey does not controvert the fact that prison staff did not receive his IRR until December 18 or 19, 2016, or that the medical department did not receive it until January 5, 2017. Doc. 48 at ¶¶ 41–42; Doc. 48-7 at p. 11. Anderson could not have placed Flowers-Bey on the captain crew on

13

December 6, 2016, in retaliation for an IRR that she had not yet received. *See id.* Accordingly, the Court grants Anderson's motion for summary judgment. Doc. 46.

### B. MDOC Defendants' motion for summary judgment

The MDOC Defendants—Uebinger, Lebon, Cutt, Fielder, Pierceall, Armistead, and Winter—move for summary judgment on Flowers-Bey's First-Amendment-retaliation and Eighth-Amendment-deliberate-indifference claims. Doc. 53. The MDOC Defendants argue that Flowers-Bey failed to exhaust his administrative remedies before filing suit, barring his claims under the Prison Litigation Reform Act ("PLRA"). Doc. 54 at p. 3.

The MDOC Defendants contend that Flowers-Bey failed to exhaust his administrative remedies because he never filed any IRRs against the MDOC Defendants for the claims he raises in his Amended Complaint. Doc. 54 at p. 3. The PLRA requires prisoners seeking relief in federal court to first exhaust the administrative remedies available at the prison level. 42 U.S.C. § 1997e(a), *unconst'l on other grounds*, *Siggers-El v. Barlow*, 433 F. Supp. 2d 811, 813 (E.D. Mich. 2006). Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e(a) is a mandatory requirement that prisoners exhaust all available administrative remedies before filing a lawsuit. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."); *Jones v. Bock*, 549 U.S. 199, 211 (2007) (same). The PLRA's administrative exhaustion requirement is an affirmative defense that defendant has the burden to plead and prove. *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005). Where a motion for summary

14

judgment is founded on an affirmative defense, the moving party has the burden to present facts establishing that defense. *See Ballard v. Rubin*, 284 F.3d 957, 964 n.6 (8th Cir.2002).

Exhaustion under the PLRA is defined by the prison's grievance procedures. *Woodford*, 548 U.S. at 93. A prisoner must comply with an agency's deadlines and other critical procedural rules to properly exhaust his remedies. *Id.* If an inmate has filed some grievance documents but has not followed all policies of the prison's administrative grievance process, the court must dismiss the inmate's claim. *Woodford*, 548 U.S. at 95 (proper exhaustion of administrative remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."). "The PLRA requires 'that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, *including deadlines*, as a precondition to bringing suit.'" *Hahn v. Armstrong*, 407 Fed. Appx. 77, 78 (8th Cir. 2011) (quoting *Woodford*, 548 U.S. at 88) (emphasis in original). For a Missouri prisoner to satisfy the exhaustion requirement, he must avail himself of the administrative grievance process established by the MDOC:

> To initiate this process, an inmate must file an Informal Resolution Request ("IRR") within fifteen days of the date of the incident giving rise to the IRR. If the inmate is dissatisfied with the response to his IRR, he can file an Offender Grievance within seven working days of receiving the response. If the inmate is dissatisfied with the response to his Grievance, he can file a Grievance Appeal within seven days of receiving that response. The failure to file timely appeal will result in the appeal being considered abandoned. Only after the inmate receives a response to his Appeal is the administrative grievance procedure exhausted (emphasis added).

*Wewerka v. Roper*, 2010 WL 4628093, at *2 (E.D. Mo. Nov. 8, 2010). In other words, "[f]or a Missouri prisoner to exhaust all administrative remedies, he must file: (i) an informal resolution request ("IRR"); (ii) a grievance; and (iii) a grievance appeal." *Perry v. Figge*, 2014 WL 2818666, at *3 (E.D. Mo. June 23, 2014)). Filing an IRR is "[t]he first attempt to resolve an offender's complaint through discussion between the offender and the appropriate staff with

15

documentation of this attempt." *Toney v. Hakala*, 2012 WL 1185028, at *2 (E.D. Mo. Apr. 9, 2012).  "Each IRR is limited to one grievable issue and should not be expanded to include other issues at any stage of the review process." *Id.*

      The MDOC Defendants contend that Flowers-Bey failed to exhaust his available administrative remedies before filing suit.  Doc. 54 at pp. 3–5.  Flowers-Bey failed to name any of the MDOC Defendants in an IRR before he filed suit.  Doc. 54 at p. 4.  In his Amended Complaint, Flowers-Bey alleges that the MDOC Defendants retaliated against him for filing an IRR and grievance, NECC 16-1808, and were deliberately indifferent to his serious medical needs.  Doc. 22 at pp. 9–14.  Puzzlingly, Flowers-Bey also cites NECC 16-1808 in the Amended Complaint under "Exhaustion of Administrative Remedies[,]" even though NECC 16-1808 did not raise any of Flowers-Bey's current allegations against the MDOC Defendants.  Doc. 54 at 3 (citing Doc. 22 at 14–16; Doc. 22-1 at 2–6.).  In NECC 16-1808, Flowers-Bey communicated his disagreement with the medical care provided by the medical department, but he never mentioned any of the MDOC Defendants or raised any of the claims currently lodged against them.  Doc. 22-1 at pp. 1–6.

      In a different IRR, NECC 17-471, Flowers-Bey alleged that non-party Sergeant Funk was harassing him by delaying Flowers-Bey's request for a job change.  Doc. 55-7 at pp. 2–4.  The IRR did not state any allegations against the MDOC Defendants.  *Id.*  When this IRR was denied, Flowers-Bey appealed, attempting to name new parties for the first time in his grievance, including Defendants Fielder, Winter, Armistead, Pierceall, and LaBon.  Doc. 55-9 at pp. 7–9.  Flowers-Bey's claims against the MDOC Defendants in the grievance were wholly unrelated to his allegations regarding Sergeant Funk in the original IRR, and the claims all stemmed from events occurring after March 31, 2017, when he filed the IRR.  *Id.*  Flowers-Bey never attempted

16

to file a new IRR against these Defendants. Doc. 55 at ¶ 38. Flowers-Bey also neglected to name Defendants Uebinger or Cutt in any IRRs for the claims asserted in his Amended Complaint. *Id.* at ¶¶ 23, 33.

Because Flowers-Bey failed to raise his claims against the MDOC Defendants in an initial IRR, he did not properly exhaust his administrative remedies under the Missouri Department of Corrections' grievance system. While Flowers-Bey attempted to add new claims against the MDOC Defendants in a grievance, NECC 17-471, those claims were unrelated to the basis for the initial IRR, contrary to MDOC grievance procedures, which states that "[e]ach IRR is limited to one grievable issue and should not be expanded to include other issues at any stage of the review process." *Toney*, 2012 WL 1185028, at *2; *see Human v. Hurley*, 2018 WL 1519376, at *4 (E.D. Mo. March 28, 2018) (plaintiff failed to exhaust his administrative remedies because an incident "was not raised in his IRR, and was only later raised in the process, in which the expanded grounds were not further addressed by prison staff."). Further, all of the claims Flowers-Bey asserted against the MDOC Defendants in the grievance were based on events occurring after he filed the IRR on March 31, 2017. Doc. 55-9 at pp. 7–9. Flowers-Bey could not possibly have exhausted his administrative remedies against the MDOC Defendants through NECC 17-471 for conduct occurring after that IRR was filed, because "a person cannot be brought into the grievance process through administrative responses if the conduct complained of occurred after the initial grievance." *Toney*, 2012 WL 1185028, at *4; *see also Washington v. Reed*, 2008 WL 2230704, at *2 (W.D. Mo. May 29, 2008) (plaintiff did not exhaust his administrative remedies for events that occurred after he filed his IRR).

Flowers-Bey does not dispute any of the MDOC Defendants' facts, but he argues instead that he exhausted his remedies "to the best of [his] ability" and that "[i]f I filed a grievance and

17

got no response then there was no available remedies[.]" Doc. 66 at p. 1.  Inmates are only excused from complying with an institution's grievance procedures when (1) prison officials have prevented them from utilizing prison grievance procedures; or (2) when officials themselves have failed to comply with the procedures.  *Wewerka*, 2010 WL 4628093, at * 5 (citing *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005)).  "A plaintiff must present some evidence, other than mere conclusory statements to demonstrate that he was precluded from fully exhausting his administrative remedies."  *Hahn v. Armstrong*, 2010 WL 575748, at *4 (E.D. Mo. Feb. 11, 2010) (citing *Gibson*, 431 F.3d at 341); *Wewerka*, 2010 WL 4628093, at * 5.  Flowers-Bey presents no evidence that there were "no available remedies" for him, only his own unsubstantiated claim that "grievance procedures had been altered."  Doc. 66 at p. 1.  This claim is belied by the fact that Flowers-Bey filed a grievance and appeal for NECC 16-1808, as well as additional IRRs and grievances in 2017, 2018, and 2019.  Doc. 48 at ¶¶ 41–54; Doc. 55 at ¶¶ 34, 36.  Flowers-Bey failed to properly exhaust his administrative remedies, so the Court need not address the merits of his claims against the MDOC Defendants.  The Court grants the MDOC Defendants' motion for summary judgment.  Doc. 53.

### IV. Conclusion

The Court grants Anderson's Motion for Summary Judgment, Doc. 46, and grants the MDOC Defendants' Motion for Summary Judgment, Doc. 53.  The Court holds that an appeal from this judgment would not be taken in good faith.

So Ordered this 17th day of September 2021.

_____
STEPHEN R. CLARK
**UNITED STATES DISTRICT JUDGE**